IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | | |
|---|---|---|
| THOMAS HOFFMAN, JOSEPH STRONG, VINCENT SHIBLER, and DAVID SHIBLER, | § § § § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 5:25-cv-4003 |
| | § | |
| UNITED STATES DEPARTMENT OF TREASURY; JANET L. YELLEN, in her Official Capacity as United States Secretary of Treasury; ADITI HARDIKAR, in her Official Capacity as Acting Assistant Secretary of the Treasury for Management; LAUREL BLATCHFORD, in her Official Capacity as the Chief Implementation Officer for the Inflation Reduction Act; AVIVA ARON-DINE, in her Official Capacity as Assistant Secretary for Tax Policy at Treasury; DANIEL WERFEL, in his Official Capacity as Commissioner of the Internal Revenue Service; COUNCIL ON ENVIRONMENTAL QUALITY; BRENDA MALLORY, in her Official Capacity as Chair of the Council on Environmental Quality; KEITH KELLY, in his Official Capacity as Chair of the Jackson County Board of Commissioners; MARK A. PRUETT, in his Official Capacity as Member of the Jackson County Board of Commissioners; LINDA GERHARDT, in her Official Capacity as Member of the Jackson County Board of Commissioners, | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § | |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs seek declaratory and injunctive relief against the United States Department of Treasury, Janet L. Yellen, in her Official Capacity as United States Secretary of Treasury, Aditi Hardikar, in her Official Capacity as Acting Assistant Secretary of the Treasury for Management, Laurel Blatchford, in her Official Capacity as the Chief Implementation Officer for the Inflation Reduction Act, Aviva Aron-Dine, in her Official Capacity as Assistant Secretary for Tax Policy at Treasury, Daniel Werfel, in his Official Capacity as Commissioner of the Internal Revenue Service, Council on Environmental Quality, Brenda Mallory, in her Official Capacity as Chair of the Council on Environmental Quality, for providing transferable tax credits in violation of federal law. Plaintiffs also seek declaratory and injunctive relief against Keith Kelly, Mark A. Pruett, and Linda Gerhardt in their official capacity as Chair and Members, respectively, of the Jackson County Board of Commissioners for violations of Kansas law.

Under the Inflation Reduction Act ("IRA" or the "Act"), the federal government committed funding for renewable energy through transferrable tax credits. The IRA's tax subsidies cover as much as 70% of the cost of new wind and solar investments.[1] Further, the Act monetizes the tax credits by allowing them to be sold for tax-free revenue.[2] The cost of the IRA's energy tax subsidies could top $1.8 trillion over the

---

[1] *See, e.g.*, Wilson Sonsini, Inflation Reduction Act: Solar, Wind, and Energy Storage Incentives Overview (Aug. 2023), https://www.wsgr.com/a/web/jAbzybUjxie6NfSJ8mJY6L/ecs-ira-solar-wind-energy-storage-incentives-overview.pdf.

[2] *See, e.g.*, Frost Brown Todd, Inflation Reduction Act – Clean Energy Tax Credits (Mar. 13, 2023), https://frostbrowntodd.com/inflation-reduction-act-clean-energy-tax-credits/.

next 10 years.[3] By the federal government's own admission, the tax subsidies have spurred an "investment boom" in new wind and solar farms.[4]

Like other industrial projects, IRA-backed renewable energy projects impact the local environment. The National Environmental Policy Act ("NEPA")—the 1969 federal law often called the "Magna Carta" of environmental law—requires federal agencies to prepare "a detailed statement" of environmental impact for all "major Federal actions significantly affecting the quality of the human environment."[5] Yet the federal entities and officials named as Defendants (collectively, the "Federal Defendants") failed to apply NEPA to renewable projects in Kansas and other states that received massive federal subsidies through the IRA. Absent NEPA review, Federal Defendants' final agency actions approving IRA tax subsidies for renewal projects are unlawful.

Additionally, the Jackson County, Kansas officials named as Defendants (collectively, the "County Defendants") have advanced zoning regulations to facilitate these projects, without meaningful review under NEPA of the potential environmental harms associated with utility-scale renewable projects, which constitutes a violation of Kansas law.

Accordingly, Federal Defendants must be ordered to require NEPA review of existing projects and enjoined from approving future IRA tax credits until the

---

[3] *See, e.g.*, Adam Michel, Energy Subsidies in the Tax Code Could Top $1.8 Trillion, Cato at Liberty (Mar. 26, 2024), https://www.cato.org/blog/energy-subsidies-tax-code-could-top-18-trillion; *see also*, Penn Wharton Budget Model, Update on the Cost of Climate and Energy Provisions in the Inflation Reduction Act, Wharton School of the University of Pennsylvania (Apr. 27, 2023), https://budgetmodel.wharton.upenn.edu/estimates/2023/4/27/update-cost-climate-and-energy-inflation-reduction-act.

[4] *See, e.g.*, Kelsey Misbrener, Treasury releases new proposed ITC rules on standalone storage, interconnection costs, *Solar Power World* (Nov. 17, 2023), https://www.solarpowerworldonline.com; *see also* U.S. Dep't of the Treasury, *IRS Propose New Rules to Drive Clean Energy Investments* (Nov. 17, 2023), https://home.treasury.gov/news/press-releases/jy1920.

[5] 42 U.S.C. § 4332(2)(C).

recipients have undergone NEPA review. This Court must also enjoin County Defendants from taking further regulatory action until an appropriate environmental review has occurred.

## I.     PARTIES

1.      The planned projects threaten and represent immediate changes and dangers to Jackson County, and its citizens, without knowing whether the planned project(s) are, indeed, without environmental risks. Such is the whole purpose of NEPA—to ensure informed decision-making that takes into account the harmony of the ecology and those that depend upon its stability.

2.      In addition to concerns about injury to the environment, Plaintiffs and other residents of Jackson County have a personal stake in the outcome, including reasonable concerns about the effects of the planned projects directly affecting their recreational, aesthetic, and economic interests in their local community.

3.      According to NextEra Energy ("NextEra"), the parent company proposing the Jeffrey Solar project in Jackson County, the planned solar project will encompass approximately 5,000 acres.[6] The scope of the project is borne out by NextEra's massive collection of land leases in Jackson County. Below is a recent copy of the map being maintained by Jackson County, Kansas regarding the properties on

---

[6] *See* https://www.nexteraenergyresources.com/jeffrey-solar/project-overview.html.

which NextEra has acquired leases for its vast solar project.



**Thomas Hoffman**

4.     Plaintiff Thomas Hoffman is a natural person and businessman, residing in Emmett, Jackson County, Kansas. He owns approximately 160 acres of land, which includes a watershed, and which he uses for residential, agricultural, and aviation purposes. Mr. Hoffman has a current residence on his property and has obtained permits to build a second residence on his property. The watershed on Mr. Hoffman's property becomes Illinois Creek, which joins Cross Creek, and eventually becomes part of the Kansas River.

5.     Mr. Hoffman is also a pilot and the owner of multiple aircraft. He owns and operates the Get Away Runway (57KS), an FAA-approved private airfield of 2,583 ft. in Jackson County, Kansas, and within the immediate proximity of the proposed solar project. The Federal Aviation Administration (FAA) has identified solar glare as a hazard for general aviation pilots, like Mr. Hoffman,[8] and published multiple regulations regarding the management of solar glare for both pilots and air traffic control personnel.[9]

6.     Mr. Hoffman is surrounded by the leases acquired by the NextEra solar project. The below map shows the status of leases acquired by NextEra in green. Mr. Hoffman's property is outlined in red. His runway is marked in blue. His property will share boundaries with the solar project that are more than a mile long, which dramatically and negatively affects the value of his property, its aesthetic appeal, and

---

[7] Photograph taken in government offices of Jackson County on or about January 10, 2025.

[8] Federal Aviation Administration, Evaluation of Glare as a Hazard for General Aviation Pilots on Final Approach, DOT/FAA/AM-15/12 (July 2015), https://www.faa.gov/sites/faa.gov/files/data_research/research/med_humanfacs/oamtechreports/201512.pdf.

[9] Federal Aviation Administration Policy: Review of Solar Energy System Projects on Federally-Obligated Airports, 86 Fed. Reg. 25801 (May 11, 2021).

its recreational uses.



7.    Not only does Mr. Hoffman live adjacent to the proposed solar farm, he

frequently drives the roads adjacent to the proposed solar farm and is concerned that

the eradication of the natural landscape for a solar farm will affect the economic value of his property and surrounding properties, as well as the ecological balance (both species and plants) that permits his community to thrive environmentally and agriculturally.

8.    The absence of any meaningful NEPA review leaves open many of these questions and poses reasonable concerns to Mr. Hoffman and others. Federal Defendants' failure to comply with NEPA creates an increased risk of actual, threatened, or imminent environmental harm and this increased risk of environmental harm injures Mr. Hoffman's concrete interests given his geographical nexus to the proposed site.

**<u>Joseph Strong</u>**

9.    Joseph Strong, Ph.D. is a natural person, residing in Delia, Jackson County, Kansas. Like other plaintiffs, Dr. Strong is also surrounded by NextEra leases. The below map shows the status of leases acquired by NextEra in green. Dr.

Strong's property is outlined in red.



10.     Only a one-lane, gravel road that requires "neighborly" passing separates Dr. Strong's property from the adjacent property that has been leased to NextEra.

11.     Dr. Strong's property and the adjacent property leased to the solar projects are sufficiently close to create a significant risk of actual, threatened, or imminent economic, aesthetic, and environmental harm. Dr. Strong is concerned that the size of the solar project and its proximity to his property will affect the economic value of his property. The placement of solar panels adjacent to his property also threatens to negatively impact the aesthetic appeal of his property and the surrounding area.

12.     Additionally, Dr. Strong is concerned about the negative effect that the

proposed solar farms will have on the recreational value of his property and its environmental safety. Dr. Strong enjoys bird watching as a hobby. He has a purple martin colony on his property and is concerned that the solar farms could affect his birdwatching and the bird colony on his property.

13.    His property also has an open well, which could be negatively affected by water runoff from the solar project given the proximity of Dr. Strong's property to the leased property.

14.    The absence of any meaningful NEPA review leaves open many unanswered questions and poses reasonable concerns to Dr. Strong and others. Federal Defendants' failure to comply with NEPA creates an increased risk of actual, threatened, or imminent environmental harm and this increased risk of environmental harm injures Dr. Strong's concrete interests given his geographical nexus to the proposed site.

**Vincent Shibler**

15.    Vincent Shibler is a natural person, residing in Delia, Jackson County, Kansas. Like other plaintiffs, Mr. V. Shibler is also surrounded by NextEra leases. The below map shows the status of leases acquired by NextEra in green. Mr.

V. Shibler's property is outlined in red.



16.    Mr. V. Shibler is concerned about the negative effect that the placement of a solar project next to his property will have on the economic value of his property. He is also concerned with the risk of flooding and other environmental harms posed by the project.[10]

17.    Mr. V. Shibler built a home on his property approximately one year ago.

---

[10] As the U.S. Department of Energy has confirmed, solar farms add significant impervious cover, increasing flooding and the risk of flooding. U.S. Dep't of Energy, Preventing and Mitigating Flood Damage to Solar Photovoltaic Systems, https://www.energy.gov/femp/preventing-and-mitigating-flood-damage-solar-photovoltaic-systems#:~:text=and%20high%20tides.-,Stormwater%20Inundation, systems%20found%20on%20federal%20sites.

His new home, where he and his family reside, is adjacent to properties leased to NextEra for the solar project. Mr. V. Shibler is concerned with the negative impact that the placement of solar panels will have on the economic value of his home and his ability to continue to enjoy the aesthetic appeal of the surrounding area. The bay windows in Mr. V. Shibler's kitchen not only will be deprived of the natural view for which the home was built but now will be subjected to glare from the solar project.

18.    Mr. V. Shibler is also concerned with the risk of flooding and environmental harm resulting from the solar project. His property is downhill from the adjacent properties leased to the solar project. The runoff from the solar panels poses a significant risk of flooding. Mr. V. Shibler also has a well and is concerned that the runoff coming downhill into his property will contaminate his well water.

19.    The absence of any meaningful NEPA review leaves open many unanswered questions and poses reasonable concerns to Mr. V. Shibler. Federal Defendants' failure to comply with NEPA creates an increased risk of actual, threatened, or imminent environmental harm and this increased risk of environmental harm injures Mr. V. Shibler's concrete interests given his geographical nexus to the proposed site.

**David Shibler**

20.    David Shibler is a natural person, residing in St. Marys, Jackson County, Kansas. Mr. D. Shibler is the father of Plaintiff V. Shibler and owns a 10-acre lot that is immediately adjacent to his Vincent's property. Thus, like the other plaintiffs, property owned by Mr. D. Shibler is also surrounded by NextEra leases. The below map shows the status of leases acquired by NextEra in green. Mr.

D. Shibler's property is outlined in red.



21.    Mr. Shibler is concerned about the negative effect that the placement of a solar project next to his property will have on the economic value of his property. Because the 10-acre lot that he owns is next to larger properties leased to NextEra, Mr. D. Shibler is concerned with the negative impact that the placement of solar panels will have on the economic value of his land and his ability to resell his land in the future. The resell value of the 10-acre lot is based, in substantial part, on the land's value as a "builders lot"—that is, a property that could serve as the site for a future buyer's homestead. Solar panels threaten to reduce the value of the property to buyers who want to build a home with panoramic rural views—not one that looks out on to a utility-scale solar project on all sides.

22.     Mr. D. Shibler is also concerned with the significant risk of flooding and environmental harm resulting from the solar project. The terrain around Mr. D. Shibler's property is not level. Mr. D. Shibler's property is at a lower elevation than the adjacent property leased to the solar project. Additionally, Mr. D. Shibler has a pond on his property. The placement of solar panels on the adjacent property will lead to countless acres of impervious cover on his neighbor's property, resulting in a spillway that directs stormwater runoff to Mr. Shibler's pond. Even without the solar panels on the adjacent property, Mr. Shibler's pond is frequently full. The placement of the solar panels threatens imminent damage in the form of flooding on Mr. Shibler's property.

23.     The absence of any meaningful NEPA review leaves open many unanswered questions and poses reasonable concerns to Mr. D. Shibler. Federal Defendants' failure to comply with NEPA creates an increased risk of actual, threatened, or imminent environmental harm and this increased risk of environmental harm injures Mr. D. Shibler's concrete interests given his geographical nexus to the proposed site.

## **Defendants**

24.     Defendant United States Department of Treasury ("Treasury") is an executive agency of the federal government and is responsible for the promulgation, administration, and enforcement of the renewable tax credits authorized under the IRA.

25.     Defendant Janet Y. Yellen is the United States Treasury Secretary. In this capacity, Yellen is responsible for the operation and management of the Treasury Department. She is sued in her official capacity.

26.     Defendant Aditi Hardikar is the Acting Assistant Secretary of the Treasury for Management. In this capacity, Hardikar is responsible for the full

integration of applicable environmental laws, including NEPA, into Treasury's missions and activities. She is sued in her official capacity.

27.     Defendant Laurel Blatchford is the Chief Implementation Officer for the Inflation Reduction Act. In this capacity, Blatchford is responsible for the implementation of the IRA across Treasury and the Internal Revenue Service ("IRS"). She is sued in her official capacity.

28.     Defendant Aviva Aron-Dine is the Assistant Secretary for Tax Policy at Treasury. In this capacity, Aron-Dine is responsible for developing and implementing federal tax policies, including the promulgation of relevant final rules. She is sued in her official capacity.

29.     Defendant Daniel Werfel is the Commissioner of the IRS, a bureau of the Treasury. In this capacity, Werfel is responsible for administering the nation's tax system, including the enforcement of relevant Final Rules. He is sued in his official capacity.

30.     Defendant Council on Environmental Quality ("CEQ") is an agency of the federal government created by NEPA. CEQ is responsible for guiding NEPA's implementation.

31.     Defendant Brenda Mallory is the Chair of CEQ and is sued in her official capacity. Mallory is the official responsible for implementing and fulfilling CEQ's duties. She is sued in her Official Capacity.

32.     Defendant Keith Kelly is the Chair of the Jackson County Board of County Commissioners ("BOCC") and is sued in his official capacity. As Chair of BOCC, Kelly is responsible for issuing and enforcing zoning regulations within Jackson County.

33.     Defendant Mark A. Pruett is a Member of BOCC and is sued in his official capacity. As a Member of the Board of County Commissioners, Pruett is

responsible for issuing and enforcing zoning regulations within Jackson County.

34.     Defendant Linda Gerhardt is a Member of BOCC and is sued in her official capacity. As a Member of BOCC, Gerhardt is responsible for issuing and enforcing zoning regulations within Jackson County.

## II.     JURISDICTION AND VENUE

35.     This Court has subject matter jurisdiction over the federal claims under 28 U.S.C. § 1331 because this suit concerns the proper interpretation of "major Federal action" under NEPA. This Court also has jurisdiction to compel an officer of the United States or any federal agency to perform his or her duty under 28 U.S.C. § 1361.

36.     This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because the state law claims arise out of the same nucleus of operative facts as the federal claims.

37.     Venue is proper in the District of Kansas pursuant to 28 U.S.C. § 1391(e) because the United States, several of its agencies, and several of its officers in their official capacity are Defendants; a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in or affect this District.

38.     The Court is authorized to award the requested declaratory relief under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 and the Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201–2202, and is authorized to award the requested injunctive relief under 28 U.S.C. § 1361.

## III.     FACTUAL BACKGROUND

### A.     Inflation Reduction Act ("IRA")

39.     On August 16, 2022, President Biden signed the IRA into law. The Act incentivizes renewable energy projects through two tax credit programs: the

Investment Tax Credit ("ITC") and the Production Tax Credit ("PTC"). Recipients can use the PTC or the ITC (but not both) for eligible renewable projects.

40.    The ITC is a dollar-for-dollar tax credit based on the capital costs of new renewable energy projects. To maximize the ITC, renewable projects must meet two labor requirements. Project managers must pay prevailing wages—as determined by the Secretary of Labor—and hire a sufficient percentage of workers from registered apprenticeship programs.[11] Provided these two labor requirements are met, the ITC covers 30% of the capital costs of new solar and wind energy projects.[12] Bonus credits are also available for projects that satisfy additional criteria. These additional credits are stackable on top of the 30 percent baseline credit. There is a 10 percent bonus for projects using components manufactured in the United States.[13] Projects in "energy communities"— areas with brownfield sites, significant fossil fuel operations, coal mines, or coal-fired plants—are eligible for a 10 percent boost.[14] Wind and solar projects serving low-income communities and housing complexes can receive additional bonus credits of up to 20%.[15] Stacking the bonus credits on top of the baseline credit, solar and wind producers can recoup up to 70 percent of their capital costs through the ITC with additional incentives.[16]

41.    The PTC provides for a tax credit for renewable electricity production. The credit is based on the electricity produced per kilowatt hour (kWh). The credit

---

[11] U.S. Dep't of the Treasury, Fact Sheet: The Inflation Reduction Act's Historic Investments in Clean Energy Manufacturing and Jobs (Oct. 20, 2023), https://home.treasury.gov/news/press-releases/jy1830.

[12] Inflation Reduction Act of 2022, Pub. L. No. 117-169, § 13102, 136 Stat. 1818, 1833 (2022).

[13] *Id.*

[14] *Id.*

[15] Inflation Reduction Act of 2022, Pub. L. No. 117-169, § 13103, 136 Stat. 1818, 1833 (2022).

[16] IRA sets the stage for US energy storage to thrive, *Utility Drive* (Nov. 7, 2022), https://www.utilitydive.com/spons/ira-sets-the-stage-for-us-energy-storage-to-thrive/635665/.

for renewable electricity production in 2024 is 0.6 cents per kWh on the sale of electricity produced from wind or solar energy.[17] The PTC is also transferrable and has bonus credit for facilities that meet domestic content or energy community requirements.[18]

42.    The IRA's tax credits are designed to funnel cash quickly to renewable-energy developers, accelerating the transition from fossil fuels. The tax credits were effective on January 1, 2022. Additionally, Congress made the ITC and PTC transferable to expand the availability of capital for renewable energy investment.[19] Through transferability, renewable energy companies that do not generate sufficient profit to absorb the tax credits can sell the credits to other companies. Proceeds from IRA tax credit sales are considered tax-free income.[20] Buyers pay as much as $96 for credits that reduce their tax bills by $100, turning the credits into a near-instant profit.[21]

43.    The IRA extended the ITC and the PTC at current levels for projects that commence construction by 2032. Under the IRA, ITC will continue to apply to investments in projects that generate electricity without greenhouse gas emissions and are placed in service after December 31, 2024.[22] Beginning January 1, 2025, the ITC is "technology-neutral" in that eligibility is based on net zero greenhouse gas emissions (not use of a particular carbon-neutral technology, such as wind or solar).

[17] Credit for Renewable Electricity Production and Publication of Inflation Adjustment Factor and Reference Price for Calendar Year 2024, 89 Fed. Reg. 56,924 (Sept. 11, 2024).

[18] Credit for Renewable Electricity Production and Publication of Inflation Adjustment Factor and Reference Price for Calendar Year 2023, 88 Fed. Reg. 40,400, (Jun. 21, 2023).

[19] Inflation Reduction Act of 2022, Pub. L. No. 117-169, § 6418 , 136 Stat. 1818, 1833 (2022).

[20] *Id.*

[21] Robert Rubin, Companies Are Snapping Up New Clean-Energy Tax Credits, Wall St. J. (Jan. 18, 2024), https://www.wsj.com/us-news/climate-environment/companies-are-snapping-up-new-clean-energy-tax-credits-593a7461.

[22] Inflation Reduction Act of 2022, Pub. L. No. 117-169, § 48E, 136 Stat. 1818, 1833 (2022).

Like the pre-2025 credits, the post-January 1, 2025, ITC program provides for federal support at the current levels: that is, transferrable credits that cover 30 to 70 percent of the capital costs of new investment in wind and solar facilities.[23] Similarly, the PTC program converts into a technology-neutral program on January 1, 2025. The program continues thereafter as a transferrable tax credit program subsidizing electricity generation from sources with zero greenhouse gas emissions.[24]

44. Since its enactment, the IRA has spurred substantial new investments in wind and solar projects. Defendant Yellen has highlighted the significant impact of the IRA on renewable energy investments. "We've seen investments grow significantly," Yellen said in March 2024. "Companies have announced almost $650 billion in investments in clean energy and manufacturing across the country since the start of the [Biden] administration."[25] A March 2024 Treasury Department blog post similarly noted: "Clean investments announcements are growing throughout the U.S."[26] Deputy Treasury Secretary Wally Adeyemo has remarked that the "IRA tax credits" produced "unprecedented levels of private sector investment" and an "investment boom" in clean energy and clean energy manufacturing."[27] Adeyemo estimates that companies have invested more than $336 billion in 1,600 new clean

---

[23] *Id.*

[24] *Id.* § 45Y.

[25] Reuters Staff, *Yellen Says Biden Tax Credits Boost Clean Energy Investment in Coal Country*, Reuters (March 13, 2024), https://www.reuters.com/sustainability/sustainable-finance-reporting/yellen-says-biden-tax-credits-boost-clean-energy-investment-coal-country-2024-03-13/.

[26] U.S. Dep't of the Treasury, The Inflation Reduction Act: a Place-Based Analysis – Updates from Q3 and Q4 2024 (March 13, 2024), https://home.treasury.gov/news/featured-stories/the-inflation-reduction-act-a-place-based-analysis-updates-from-q3-and-q4-2023.

[27] U.S. Dep't of the Treasury, *IRS Propose New Rules to Drive Clean Energy Investments* (Nov. 17, 2023), https://home.treasury.gov/news/press-releases/jy1920.

energy projects since the enactment of the IRA.[28]

45.    Industry analysts share the Treasury's assessment that the IRA tax credits have generated a boom in renewable energy investment. According to the Rhodium Group, investment in these projects increased by 71% from the two years preceding the IRA.[29] IRA tax credit sales are increasing "faster than expected," notes Patrick Worrall of the energy marketplace LevelTen Energy.[30] The spike in renewable investment since the enactment of the IRA has caused budget analysts to increase their estimates of the total cost of the IRA's clean energy tax credits. The nonpartisan University of Pennsylvania's Penn Wharton Budget Model recently lifted its estimate of the cost of the IRA's clean energy tax subsidies from $384 billion over ten years to over $1 trillion for the same timeframe.[31] Others forecast that the IRA's tax subsidies will cost taxpayers as much as $1.8 trillion over ten years.[32]

---

[28] U.S. Dep't of the Treasury, Remarks by Deputy Secretary of the Treasury Wally Adeyemo on the Inflation Reduction Act (Oct. 13, 2024), https://home.treasury.gov/news/press-releases/jy2647.

[29] Rhodium Group, *Clean Investment Monitor: Tallying the Two-Year Impact of the Inflation Reduction Act* (Aug. 7, 2024), https://rhg.com/research/clean-investment-monitor-tallying-the-two-year-impact-of-the-inflation-reduction-act.

[30] Emma Penrod, NextEra expects up to $1.8B by 2026 in renewable energy tax credit sales, CFO says, Utility Dive (Oct. 27, 2023), https://www.utilitydive.com/news/nextera-energy-nee-earnings-tax-credit-transfer/698005.

[31] Penn Wharton Budget Model, Update on the Cost of Climate and Energy Provisions in the Inflation Reduction Act, *Wharton School of the University of Pennsylvania* (Apr. 27, 2023), https://budgetmodel.wharton.upenn.edu/estimates/2023/4/27/update-cost-climate-and-energy-inflation-reduction-act (estimating the ten-year cost of the IRA's climate and energy provisions at over $1 trillion).

[32] Adam Michel, Energy Subsidies in the Tax Code Could Top $1.8 Trillion, *Cato at Liberty* (Mar. 26, 2024), https://www.cato.org/blog/energy-subsidies-tax-code-could-top-18-trillion; *see also*, Penn Wharton Budget Model, Update on the Cost of Climate and Energy Provisions in the Inflation Reduction Act, *Wharton School of the University of Pennsylvania* (Apr. 27, 2023), https://budgetmodel.wharton.upenn.edu/estimates/2023/4/27/update-cost-climate-and-energy-inflation-reduction-act (estimating the ten-year cost of the IRA's climate and energy provisions at over $1 trillion.

---

## B.    National Environmental Policy Act ("NEPA")

46.    For more than fifty years, NEPA has served as our nation's bedrock law for environmental protection by directing federal agencies to make well-informed decisions that protect public health and the environment. In enacting NEPA, Congress recognized the "critical importance of restoring and maintaining environmental quality to the overall welfare and development of man" and emphasized a national policy of cooperation with state and local governments as well as concerned individuals and private organizations "to use all practicable means . . . to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."[33]

47.    Consistent with this overarching policy, Congress directed federal agencies to implement NEPA "to the fullest extent possible."[34] As the Supreme Court explained, Congress recognized that NEPA's desired goals could be incorporated into the federal government's standard operations "only with great difficulty." Accordingly, Congress included in NEPA "action-forcing procedures which will help to insure that the policies of the [NEPA] are implemented."[35] Crucial to the implementation of NEPA across the whole of government is the requirement that federal agencies prepare "a detailed statement" assessing the environmental impacts of all "major Federal actions significantly affecting the quality of the human environment."[36]

48.    A "detailed statement" of a "major Federal action" under NEPA results in Environmental Assessments ("EA") and Environmental Impact Statement ("EIS").

---

[33] 42 U.S.C. § 4331(a).

[34] 42 U.S.C. § 4332.

[35] *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979) (quoting S. Rep. No. 91-296, at 19 (1969)).

[36] 42 U.S.C. § 4332(2)(C).

These are often large, detailed documents that outline the potential environmental effects of a proposed major federal action. EAs must be completed within a year and can be up to 75 pages. An EIS includes a thorough description and discussion of each of the five statutorily required topics: (1) direct and indirect environmental impacts, (2) adverse and beneficial effects, (3) alternatives, (4) short- and long-term effects and relationships (*i.e.*, cumulative effects), and (5) irreversible and irretrievable commitments of resources. The final requirement is full disclosure of all impacts to all interested parties, and subsequently providing an opportunity for them to make and submit comments. An EIS must be completed within two years and can be up to 300 pages (excluding tables and appendices). Consistent with NEPA's policy of careful, informed decision-making where major Federal actions affecting the environment are involved, the creation and production of these required items is significant, laborious, and time-consuming.[37]

### C.    Council on Environmental Quality

49.    NEPA created CEQ within the Executive Office of the President, to be run by three Commissions appointed by the President and confirmed by the Senate.[38] CEQ's job is to "review and appraise" agencies' compliance with NEPA, "make recommendations to the President with respect thereto," and to "develop and recommend to the President national policies to foster and promote the improvement of environmental quality."[39]

50.    CEQ has promulgated regulations describing the "detailed statement" NEPA requires for proposed agency action "significantly affecting the quality of the

---

[37] For example, the EIS for the Kansas River Commercial Dredging Final Environmental Impact Statement was 686 pages, including tables and appendices. *See* https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=240401.

[38] 42 U.S.C. § 4342.

[39] *Id*. § 4344(3)–(4).

human environment."[40] Under CEQ's regulations, a federal agency must begin by determining whether the proposed action would have a significant environmental effect and then document its findings in a concise statement CEQ called an "environmental assessment."[41] If the agency finds that the action's environmental effect would be significant, it must prepare an "environmental impact statement."[42] *Id*. If it does not so find, the agency must issue a "finding of no significant impact" documenting its conclusion.[43] CEQ regulations also state that federal agencies may forego preparing an EIS or EA if the proposed action is "categorically excluded" from NEPA's usual requirements because it "normally does not have significant effects" on the environment.[44] The D.C. Circuit recently held, however, that CEQ regulations, including those pertaining to categorical exclusions, are advisory and not binding on federal agencies.[45]

## D.    Department of the Treasury NEPA Directive

51.    Treasury Department Directive 75-02 establishes the agency's standing protocol for implementing NEPA. Promulgated in May 2015, the directive requires "all bureaus" within the Treasury Department to "consider environmental quality as equal with economic, social, and other relevant factors in program development and decision making processes." Additionally, the directive provides that an agency must "fully evaluate its actions to ensure compliance with the requirements of NEPA[.]" It emphasizes a policy of cooperation with "federal, state, and local agencies and other

---

[40] 42 U.S.C. § 4332(C); *see also* 40 C.F.R. § 1508.11 (1978).

[41] *Id*. §§ 1501.3–.4, 1508.9.

[42] *Id*.

[43] *See id*. § 1508.13.

[44] 40 C.F.R. § 1501.3(c)(1), 1501.4.

[45] *Marin Audubon Soc'y v. FAA*, 121 F.4th 902 (D.C. Cir. 2024).

organizations to provide decision-makers with the technical and other aspects of environmental planning."[46]

52.     Directive 75-02 authorizes the Assistant Secretary for Management ("ASM") to "integrate fully all applicable environmental laws and regulations into Treasury's missions and activities." The directive charges the ASM "to ensure that all actions taken by Treasury" with respect to NEPA, "are duly coordinated with appropriate federal, state, and local entities." Further, the ASM is responsible for providing guidance on Treasury's environmental requirements and assisting in "reviewing and assessing the environmental impact of proposed Treasury actions." The ASM is charged with clearing the EAs and EISs that originate from within the Treasury, and with coordinating the review of NEPA review documents that are submitted by other federal agencies for Treasury's input.

53.     The directive charges bureau heads within Treasury to prepare EAs and EISs "when an action or policy area" is within their respective jurisdiction. It directs bureau heads to be proactive and ensure that there is "early involvement" by Treasury "in all actions" triggering NEPA. Bureau heads must designate a NEPA point of contact, coordinate "communications with CEQ" and be "responsive to requests from CEQ and other relevant agencies . . . in connection with the implementation of NEPA[.]" Treasury's NEPA point of contact is tasked with identifying federal actions requiring an EA or EIS. In conjunction with the ASM, bureau heads determine "on a case-by-case basis" whether "environmental documentation is required" as part of Treasury's duties under NEPA. Bureau heads are responsible for preparing EAs and EISs for Treasury.

---

[46] U.S. Dep't of Treasury Directive 75-02 (May 6, 2015), https://home.treasury.gov/about/general-information/orders-and-directives/td75-021.

### E.     Treasury's Final Actions Implementing the IRA

54.     On April 30, 2024, IRS issued final rules on the transferability of the ITCs and PTCs under the IRA.[47] On June 25, 2024, IRS issued final regulations regarding the increased credit amounts available for taxpayers satisfying the prevailing wage and registered apprenticeship.[48] On December 12, 2024, IRS issued final regulations defining the scope of investments—"energy property"—whose capital costs may be covered through ITCs under the IRA.[49] Treasury has explained that the final regulations were designed to give clarity to project developers "to undertake major investments to produce more clean power."[50] On January 15, 2025, the IRS issued final regulations determining eligibility for the technology-neutral ITC and PTC for clean energy investment and output commencing after December 31, 2024.[51]

55.     None of the Defendants' final actions require NEPA review concerning the IRA's tax credits. Defendants have not mandated an EIS, EA, or found that a categorical exclusion applies to the provision of the IRA tax credits pursuant to their final actions.

### F.     Renewable Energy Boom in Kansas

56.     IRA tax credits have driven a renewable energy boom in Kansas.

---

[47] *Transfer of Certain Credits*, 89 Fed. Reg. 34770 (Apr. 30, 2024).

[48] *Increased Amounts of Credit or Deduction for Satisfying Certain Prevailing Wage and Registered Apprenticeship Requirements*, 89 Fed. Reg. 53184 (June 25, 2024).

[49] *Definition of Energy Property and Rules Applicable to the Energy Credit*, 89 Fed. Reg. 100598 (Dec. 12, 2024).

[50] U.S. Dep't of Treas., Treasury and IRS Issue Final Rules on Investment Tax Credit to Produce Clean Power, Strengthen Clean Energy Economy (Dec. 4, 2024), https://home.treasury.gov/news/press-releases/jy2736.

[51] Section 45Y Clean Electricity Production Credit and Section 48E Clean Electricity Investment Credit (Jan. 15, 2025), https://public-inspection.federalregister.gov/2025-00196.pdf.

Southwest Power Pool, a non-profit regional transmission organization, estimates that solar power supply in Kansas will increase by 34 times within four years.[52] Individual projects are starting across the state. In February 2024, Sunflower Electric Power Corporation announced the Boot Hill Solar Project, a 1,000-acre project near Dodge City, Kansas. The 150-megawatt project is scheduled to launch in 2026. In June 2023, Sunflower announced a 20-megawatt solar energy project it plans to develop near Russell, Kansas. In April 2024, the Kansas Sky Energy Center received a permit from the Douglas County Commissioners for a 159-megawatt solar farm owned and operated by Evergy, with designs provided by a subsidiary of Royal Dutch Shell. The Florida-based backer of the Jeffrey Solar project has publicly disclosed the significance of the IRA tax credits as a source of new capital fueling its expansion. Just weeks after the IRA was enacted, NextEra Energy Resources, LLC, sent a letter to BOCC informing the Commissioners that the energy company was interested in developing a solar project in Jackson County. NextEra received $400 million in transferable tax credits in 2023 and expects to bring in $1.6-$1.8 billion in tax credit sales by 2026.[53]

### G.    Environmental Concerns with Renewable Energy Projects in Kansas

57.    Kansas residents and citizen groups have raised concerns regarding the siting and operation of large, commercial solar developments in Kansas. In a 2022 presentation to the Kansas Senate Committee on Utilities Presentation, a citizens group called Kansans for Responsible Solar highlighted the environmental risks

---

[52] Celia Hack, For years, wind was the power source of the plains. Now, Kansas is seeing solar step up. *KMUW* (Nov. 7, 2023), https://www.kmuw.org/2023-11-07/kansas-solar-growth.

[53] Emma Penrod, NextEra expects up to $1.8B by 2026 in renewable energy tax credit sales, CFO says, Utility Dive (Oct. 27, 2023), https://www.utilitydive.com/news/nextera-energy-nee-earnings-tax-credit-transfer/698005.

posed by the West Gardner Solar project, a planned 3,200-acre solar facility in Douglas County, Kansas. The group cited "human health and safety, environmental and wildlife impacts . . . diminished agricultural and livestock land use, fire risks, emergency response capabilities, decreased property values, diminished views and rural character, inverter noise, glare, soil erosion, flooding from stormwater run-off, ground water contamination, toxic herbicides and pesticide use, deforestation, [and] historical preservation concerns."[54] More than two years later, amid continuing public concerns in Douglas County, construction is still yet to start on the West Gardner Solar project.

58.    In Jackson County, citizens have repeatedly raised concerns about the impact of the proposed Jeffrey Solar plant on the local environment. Meeting minutes of BOCC show concerns from the Prairie Band Potawatomi Nation Council that the proposed plan may conflict with the 1846 treaty between the Potawatomi Nation and the United States.[55] Citizens expressed reservations about the safety precautions needed to protect the batteries required to store the energy produced from the proposed plant, the effect of the proposed plant on property values, and a host of environmental concerns. In response, the county has said that it plans to propose "very strict regulations" for the proposed solar plant and has discussed limiting the size of the site to 2,000—less than half of what was initially proposed for Jeffrey Solar.[56] But Jackson County residents are concerned that the BOCC is not fully considering the potential environmental impact of the proposed site. In September

---

[54] Kansas for Responsible Solar, Kansas Senate Committee on Utilities Presentation (Mar. 16, 2022), https://www.kslegislature.gov/li_2022/b2021_22/committees/ctte_s_utils_1/documents/testimony/20220316_01.pdf.

[55] BOCC Meeting Minutes (May 28, 2024) https://www.jacksoncountyks.com/AgendaCenter/ViewFile/Minutes/_05282024-157.

[56] BOCC   Meeting Minutes (Sept. 16, 2024),   https://www.jacksoncountyks.com/AgendaCenter/ViewFile/Minutes/_09162024-175.

2024, the Jackson County Planning and Zoning Commission voted to impose a two-year moratorium on solar development in the county.[57] The BOCC—whose members have visited NextEra Duane Arnold solar facilities in Iowa and have met with NextEra officials at their homes—later overruled the moratorium.[58]

59.   The Jeffrey Solar project implicates federal and state statutory protections for endangered and threatened species, critical habitats, and water usage. According to the Kansas Department of Wildlife and Parks, five threatened or endangered species and eight species in need of conservation are found in Jackson County. Further, one threatened and endangered species—the least tern—has a critical habitat designated within the county.[59] Additionally, there are active watershed districts within Jackson County.[60] The county water district, a non-profit quasi-municipality, operates eight water towers and over 500 miles of pipeline in the ground, and supplies water to over 2,000 water customers throughout five counties, six cities, and the Prairie Band Potawatomi reservation. The proposed construction of a utility-scale solar facility near the county's water infrastructure and watershed raises significant environmental concerns that must be addressed carefully. Yet County Defendants initiated approval for regulations allowing utility-scale solar projects in Jackson County without any NEPA review of the potential environmental

---

[57] Ali Holcomb, Commissioners OK rules of conduct for meetings, remove member from planning commission, The Holton Recorder (Oct. 23, 2024), https://www.holtonrecorder.net/sites/default/files/Oct.%2023%2C%202024.pdf.

[58] *Id.*; BOCC, Meeting Minutes (March 4, 2024), https://www.jacksoncountyks.com/AgendaCenter/ViewFile/Minutes/_03042024-145; BOCC Meeting Minutes (March 11, 2024), https://www.jacksoncountyks.com/AgendaCenter/ViewFile/Minutes/_03112024-146.

[59] Kansas Department of Wildlife & Parks, Threatened and Endangered (T&E) Species, https://ksoutdoors.com/Services/Threatened-and-Endangered-Wildlife/List-of-all-Kansas-Counties/Jackson (last visited Dec. 31, 2024).

[60] Kansas Department of Agriculture, Kansas Watershed Districts Map 2020, https://www.agriculture.ks.gov/home/showpublisheddocument/1774/638457507618930000) (last visited Dec. 31, 2024).

impact of such projects. County Defendants' regulations—the "Draft Solar Resolution Version VII," dated December 26, 2024 ("Solar Resolution")—green light commercial solar projects up to 2,000 acres and authorizes the Commissioners to approve modifications that permit even larger projects without NEPA review.[61] County Defendants have sent the Solar Resolution to the Jackson County Planning Commission for review. After completing its review, the Planning Commission will return Solar Resolution to the County Defendants for final approval even though no NEPA review has begun or been scheduled for the proposed commercial solar projects in Jackson County.

60.    The federal government and private litigants have raised environmental concerns about renewable development in other jurisdictions. In November 2022, the U.S. Department of Justice and the Environmental Protection Agency settled with AL Solar, a solar farm in rural Alabama, over violations of the Clean Water Act. EPA Acting Assistant Administrator Larry Starfield said the settlement should "send an important message to the site owners of solar farm projects that these facilities must be planned and built in compliance with all environmental laws, including those that prevent the discharge of sediment into local waters during construction."[62]

61.    Despite these and other environmental concerns, none of the projects planned or completed in Kansas since the passage of the IRA have undergone NEPA review. No EISs or EAs have started or been completed for any of the solar projects announced in Kansas since the enactment of the IRA. Nor have Federal Defendants

---

[61] BOCC, 24-12-26 Draft Solar Resolution Version VII, https://www.jacksoncountyks.com/DocumentCenter/View/647/24-12-26-Draft-Solar-Resolution-version-VII (last visited Jan. 14, 2025).

[62] Hadley Hitson, "A long time coming": EPA settles pollution case against Alabama solar farm after four years, Montgomery Advertiser (Nov. 28, 2022), https://www.montgomeryadvertiser.com/story/news/2022/11/29/lafayette-solar-farm-clean-water-act-violations/69672327007/.

deemed any solar project in Kansas receiving IRA tax credits to fall with a "categorical exclusion." Further, County Defendants' Solar Resolution is not premised on the finds from any NEPA review, nor does it require such a review as part of the approval for utility-scale solar projects in Jackson County.

## IV.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

#### Violation of the APA and NEPA by Adopting Regulations Contrary to NEPA, 5 U.S.C. § 706(2); 42 U.S.C. §§ 706(2); 42 U.S.C. §§ 4321 *et seq.*

62.    The allegations in all preceding paragraphs are reincorporated herein.

63.    The rules and regulations for the provision, use, and transferability of the IRA tax credits described herein constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

64.    The Administrative Procedure Act requires this Court to hold unlawful and set aside any agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). An agency does not have authority to adopt a regulation that is "plainly contrary to the statute." *United States v. Morton*, 467 U.S. 822, 834 (1984); *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 703 (1995).

65.    Federal Defendants' rules and regulations for the provision, use, and transferability of the IRA tax credits are "not in accordance with law" because they violate NEPA's text requiring "a detailed statement" assessing the environmental impacts of all "major Federal actions significantly affecting the quality of the human

environment." Federal Defendants' rules and regulations pertaining to the IRA tax credits are unlawful because they, among other things, fail to require that projects receiving substantial federal support through the IRA tax credits undergo NEPA review as required by law.

### SECOND CAUSE OF ACTION

### Violation of NEPA and the APA for Failure to Prepare an EA or EIS on the Final Rule
### 42 U.S.C. § 4332(2)(C); 5 U.S.C. § 706(2)

66.    The allegations in all preceding paragraphs are reincorporated herein.

67.    NEPA requires federal agencies to take a "hard look" at the environmental consequences of a proposal before acting on it. *See* 42 U.S.C. § 4332. That is, a federal agency must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment[.]" *Id.* § 4332(2)(C).

68.    An EIS must discuss, among other things: the environmental impact of the proposed federal action, any adverse and unavoidable environmental effects, any alternatives to the proposed action, and any irreversible and irretrievable commitment of resources involved in the proposed action. *Id.*

69.    Treasury and IRS are subject to NEPA.

70.    Federal agencies subject to NEPA must always prepare an EIS if a project is "likely to significantly affect the quality of the human environment." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 703 (10th Cir. 2009). In making this determination, agencies are "to consider all effects on the human environment, both direct and indirect[.]" *Utah Shared Access All. v. U.S. Forest Serv.*, 288 F.3d 1205, 1214 (10th Cir. 2002). If an agency decides not to prepare an EIS, it must supply a "'hard look' analysis" that contains more than "conclusory statements" and contains an "adequate discussion" of why the project's impacts are

not significant. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1178 (10th Cir. 2023).

71.    The IRA tax credits raise substantial questions that the projects they fund may cause degradation of some human environmental factor. Federal Defendants' rules and regulations on the provision, use, and transferability of the IRA tax credits have a major impact on the environment because they allow utility-scale, industrial projects with significant unstudied and undisclosed impacts to move forward with no or insufficient environmental review in violation of NEPA. Excusing these projects from NEPA will result in the federal government providing significant support to projects without fully understanding the impacts of those projects on actions on water and air quality, and sensitive, threatened, and endangered wildlife.

72.    Federal Defendants provided no legally sufficient justification—let alone an "adequate discussion"—for failing to comply with NEPA in promulgating the rules and regulations on the provision, use, and transferability of the IRA tax credits.

73.    Federal Defendants' failure to take a "hard look" at the environmental impacts of the IRA rules and regulations before their promulgation was arbitrary and capricious, an abuse of discretion, and contrary to the procedural requirements of NEPA and the APA. The final rules therefore should be set aside.

### THIRD CAUSE OF ACTION

### Violation of APA for Arbitrary and Capricious Actions Contrary to 5 U.S.C. § 706

74.    The allegations in all preceding paragraphs are reincorporated herein.

75.    The APA requires this Court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

76.    Federal Defendants' actions—issuing rules and regulations on the

provision, use, and transferability of IRA tax credits that categorically ignoring the well-established NEPA requirements to suit Federal Defendants' policy preferences—are arbitrary and capricious and not otherwise in accordance with the law.

## FOURTH CAUSE OF ACTION

### Violation of K.S.A. § 19-2964 for Unreasonable Regulations that Are An Unlawful Exercise of the County's Zoning Authority

77.    The allegations in all preceding paragraphs are reincorporated herein.

78.    K.S.A. § 19-2964 requires County Commissioners to enact reasonable zoning acts, regulations, or amendments and provides a cause of action under K.S.A. § 19-233 for Kansas residents who have an interest in property affected by zoning acts, regulations, or amendments that fail to meet the reasonableness standard.

79.    County Defendants' Solar Resolutions are an amendment to the Jackson County zoning regulations and therefore subject to the reasonableness standard set by K.S.A. § 19-2964.

80.    County Defendants' Solar Resolution purports to address the approval process for utility-scale solar projects with potentially significant environmental impacts on the local community, and yet the Resolution was proposed without the aid and assistance of NEPA review and the Resolution does not require such a review for the approval of individual utility-scale solar projects. Seeking to amend the local zoning regulations to allow for industrial projects that could have significant environmental impacts without undertaking a meaningful environmental review is an unreasonable exercise of the BOCC's zoning authority contrary to K.S.A. § 19-2964.

81.    County Defendants' Solar Resolution should be set aside.

## V.    DEMAND FOR JUDGMENT

Plaintiffs respectfully request the following relief from the Court:

1.    A declaratory judgment that Federal Defendants' rules and regulations for the provision, use, and transferability of IRA tax credits are substantively unlawful under the APA.

2.    Set aside Federal Defendants' rules and regulations for the provision, use, and transferability of IRA tax credits because they are substantively unlawful.

3.    Declare that Federal Defendants violated the law by promulgating rules and regulations for the provision, use, and transferability of IRA tax credits without requiring NEPA review for projects receiving major federal support.

4.    Declare Federal Defendants violated the law by promulgating rules and regulations for the provision, use, and transferability of IRA tax credits without preparing an EA or an EIS evaluating the environmental and public health impacts of the new rules and regulations.

5.    Declare that County Defendants violated  K.S.A. § 19-2964 because the Solar Resolution is an unreasonable exercise of the BOCC's zoning authority.

6.    Set aside the Solar Resolution as an unreasonable amendment of the Jackson County zoning regulations under K.S.A. § 19-2964.

7.    A final, permanent injunction preventing Federal Defendants from implementing, enforcing, or relying on the rules and regulations for the provision, use, and transferability of IRA tax credits.

8.    A final, permanent injunction preventing County Defendants from implementing, enforcing, or relying on the Solar Resolution.

9.    All other relief to which the Plaintiffs may show themselves to be entitled.

DATED: January 15, 2025                          Respectfully submitted,

                                                 */s/ Edward D. Greim*
                                                 Edward D. Greim
                                                 Kansas Bar No. 21077
                                                 edgreim@gravesgarrett.com

                                                 */s/ Chandler Carr*
                                                 Chandler Carr
                                                 Kansas Bar No. 26853
                                                 ccarr@gravesgarrett.com

                                                 **GRAVES GARRETT GREIM LLC**
                                                 1100 Main St., Ste. 2700
                                                 Kansas City, MO 64105
                                                 Phone: (816) 256-3181
                                                 Fax: (816) 222-0534

                                                 Christopher L. Peele*
                                                 Texas Bar No. 24013308
                                                 chris@pntlawfirm.com

                                                 Austin R. Nimocks*
                                                 Texas Bar No. 24002695
                                                 austin@pntlawfirm.com

                                                 Michael C. Toth*
                                                 Texas Bar No. 24100608
                                                 mike@pntlawfirm.com

                                                 **PNT Law Firm**
                                                 206 Wild Basin Rd. S.
                                                 Bldg. A, Ste. 206
                                                 Austin, TX 78746
                                                 Phone: (512) 522-4893
                                                 Fax: (512) 522-4893

                                                 *Counsel for Plaintiffs*

* Motions for admission *pro hac vice* forthcoming